FILED

03/10/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0346

DA 23-0346

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 45

STATE OF MONTANA,

 Plaintiff and Appellee,

 v.

KEVIN WESLEY SANDBERG,

 Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-21-531
Honorable Jason Marks, Presiding Judge

COUNSEL OF RECORD:

 For Appellant:

  Tammy A. Hinderman, Appellate Defender Division Administrator,
Charlotte Lawson, Assistant Appellate Defender, Helena, Montana

 For Appellee:

  Austin Knudsen, Montana Attorney General, Roy Brown, Assistant
Attorney General, Helena, Montana

  Matthew C. Jennings, Missoula County Attorney, Brian Lowney,
Deputy County Attorney, Missoula, Montana

     Submitted on Briefs: September 10, 2025

     Decided: March 10, 2026

Filed:

_____
    Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     Kevin Wesley Sandberg appeals his Fourth Judicial District Court jury convictions of sexual intercourse without consent, aggravated kidnapping, and robbery. Sandberg argues that reversal of his convictions is warranted on the basis that the District Court erred in permitting pervasive reference to Tammany Andrade—the complaining witness—as "victim" throughout trial, undermining Sandberg's right to be presumed innocent and depriving him of a fair trial. Sandberg also asserts that reversal is warranted on the grounds that the District Court abused its discretion in overruling his M. R. Evid. 402 and M. R. Evid. 404(b) objections, allowing the State to introduce irrelevant and inadmissible character evidence. We restate the issues on appeal as follows:

1. *Whether Sandberg was deprived of a fair trial by repeated and pervasive use of the word "victim" in reference to the complaining witness.*

2. *Whether the District Court abused its discretion in admitting Sandberg's statement to his girlfriend requesting she "wipe" his phone over Sandberg's Rule 402 and Rule 404(b) objections.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     Sandberg and Andrade met while living in a homeless encampment commonly referred to by its residents as the "Island," which is located on the Clark Fork River under the Reserve Street Bridge in Missoula, Montana.

¶3     On April 11, 2021, Andrade and her boyfriend at the time, Sampson Adkins, accompanied Sandberg to the apartment complex of an individual believed to have stolen from Sandberg at some point in the past. While Sandberg and Adkins went inside the apartment to confront the individual, Andrade remained in the vehicle which Sandberg had

2

parked outside. When Sandberg and Adkins finished up and were walking back to meet Andrade, a man came up from behind Sandberg and struck him over the head with a tire iron, knocking him unconscious. Andrade and Adkins then "grabbed a bunch of stuff" from the vehicle and fled the scene, leaving Sandberg unconscious in the parking lot.

¶4 Sandberg was ultimately brought to a hospital by ambulance. Following his release, Sandberg discovered that some of his belongings had been taken from the vehicle, including—according to Sandberg—an envelope of about $2,700 in cash. Sandberg suspected Andrade of the theft and attempted to follow up with her, but she would not return his calls or messages and appeared to have moved off the Island.

¶5 Nearly five months later, on September 9, 2021, Sandberg heard that Andrade was on the Island at a camp belonging to Bert Hill. That afternoon, around 12:00 p.m., Sandberg went to Hill's camp to speak with Andrade. When Sandberg arrived, Hill stepped out, leaving Sandberg and Andrade to talk alone inside the tent. Several hours later, around 4:00 p.m., Andrade called 911 from a nearby Planet Fitness claiming she had been sexually assaulted by Sandberg. Andrade claimed that Sandberg kept her in a tent, threatened to kill her, beat her with a small baseball bat, and forced her to perform oral sex. Andrade also claimed that Sandberg had stolen her wallet, which she had found at a nearby camp, emptied of all her debit cards, gift cards, and IDs.

¶6 Andrade was examined for sexual trauma at the First Step Resource Center that evening, where she complained of a sore throat and knee pain. While the nurse treating Andrade did not observe any bruising to her knee or leg, it was noted that Andrade's tonsils

3

were swollen and her throat was red. Andrade's clothes, face, and mouth were swabbed for DNA analysis.

¶7 That evening, officers arrested Sandberg on the Island. In the process, officers found methamphetamine on his person, secured a sample of his DNA, and took pictures of his tent, as well as Hill's camp. Sandberg admitted to officers that he received oral sex from Andrade, and though he maintained that Andrade consented, he admitted to engaging in some conduct that Andrade could have perceived as threatening.

¶8 The State charged Sandberg with sexual intercourse without consent, criminal possession of dangerous drugs, aggravated kidnapping, and robbery. A three-day jury trial commenced on November 30, 2022.

¶9 At trial, Andrade began her testimony by discussing the start of her friendship with Sandberg and recounting the events of April 11, 2021—the evening in which Sandberg was physically assaulted by the man with the tire iron. According to Andrade, she was acquainted with Sandberg through drugs—primarily through using and purchasing methamphetamine from him. Andrade said she had been present when Sandberg was assaulted and claimed she and Adkins had unintentionally taken methamphetamine belonging to Sandberg when they fled the scene. Andrade admitted on cross-examination that while Sandberg had sent her a "non-threatening" text on Facebook Messenger when he got out of the hospital, she proceeded to block Sandberg because she "didn't really know what to tell him" and had a sense that "he wanted the drugs back."

¶10 As to the events of September 9, 2021, Andrade's testimony largely reflected her prior statements to law enforcement—that is, that Sandberg kept her in the tent, hit her

4

several times, and forced her to perform oral sex. Andrade testified that Sandberg proposed that she pay him $400 at midnight and provide him oral sex as repayment. According to Andrade, she verbally expressed to Sandberg that she did not consent to oral sex. When the prosecutor asked Andrade how she expressed this, she replied, "I said I'd do the 400." Throughout her testimony, she persisted in her assertion she did not consent to the oral sex.

¶11 The State also presented testimony at trial from Officer Harrington who had responded to Andrade's complaint, as well as testimony from Officer Smith, who assisted Harrington with conducting an initial interview of Andrade and later arrested Sandberg at his camp on the Island. Additionally, the State presented testimony from Detective Brueckner, who interviewed Sandberg at the police station as part of the investigation; Jaqueline Towarnicki, the sexual assault nurse examiner at First Step who examined Andrade the evening of the alleged assault; Sampson Adkins, Andrade's ex-boyfriend; Bert Hill; and several State Crime lab employees who testified regarding forensic evidence—specifically, that the DNA sample collected from Sandberg could not be excluded as a contributor to the foreign DNA profile of the sample collected from Andrade's cheek swab.

¶12 During the presentation of the State's case, the prosecutor, as well as several of its witnesses, repeatedly used the word "victim" in reference to Andrade. While the first few references occurred without objection, after the prosecutor and Officer Harrington referred to Andrade as "the victim," defense counsel objected to use of the term, which the court overruled as not unduly prejudicial. Upon the State making further references to Andrade as "the victim," counsel secured a standing objection. Though the District Court overruled

5

the objection, it acknowledged, "it would be highly problematic" for the court itself to refer to Andrade as a "victim."

¶13    In his testimony, Hill recalled overhearing Sandberg and Andrade talking as he waited outside his tent. According to Hill, Sandberg was "doubtful" of Andrade; while Sandberg was asking if she stole from him, he caught her in a lie as she tried to blame Adkins. Hill testified that Sandberg became angry enough at one point in the beginning of the conversation that Hill returned to the tent and asked Andrade if she was still comfortable talking with Sandberg but explained that Andrade "just blew [him] off" in response. Hill stated that he did not want to listen to them argue and left his camp for about one to two hours. When Hill returned, he recalled witnessing Sandberg exit the tent for a moment and stating, "I'm a man." According to Hill, Sandberg then returned to the tent and Hill heard what he assumed to be consensual oral sex based on some sort of arrangement. Hill explained that once he understood what was happening, he moved far enough away from his camp so that he could no longer hear the interaction. Hill then returned when he could see Sandberg and Andrade outside of the tent.

¶14    Following the State's case-in-chief, Sandberg testified in his own defense. While Sandberg did not contest that he possessed methamphetamine at the time of his arrest, he asserted that he did not kidnap, sexually assault, or rob Andrade. Sandberg explained that he and Andrade had been friends for years, which was why he was upset by her "leaving [him] for dead" back in April. He admitted to yelling at Andrade when he initially confronted her about the money she stole from him and stated that Andrade "passed out" in response, though Sandberg described this episode as a "planking routine" in which

6

Andrade "went into immediate rigor mortis," as if she was "a billy goat." He testified that he left the tent for a moment, returned, and "rapped her on the bottom of her feet with his bat" to try to wake her. Andrade then came to, screaming about being in pain and telling Sandberg that she had fallen and injured her leg earlier in the day. According to Sandberg, Andrade quickly calmed down and he began telling her all about what happened to him "when she left [him] for dead."

¶15 When asked whether the oral sex was consensual, Sandberg explained that it was. Sandberg testified that once it became apparent Andrade could not immediately pay him, she began making repeated advances and removed his pants. He recalled that she liked providing the oral sex. Sandberg acknowledged being aware of Andrade's belief that he could hurt her and ultimately conceded that he told Andrade when she could leave. He also confessed to taking Andrade's purse and rummaging through it but testified that he did not steal anything. In his testimony, Sandberg was steadfast in maintaining that Andrade consented to oral sex and explained some of his prior statements to law enforcement regarding his conduct potentially being perceived as threatening.

¶16 On cross-examination, the prosecution questioned Sandberg about whether he ever asked his girlfriend to "wipe [his] phone," alluding that he had done so because he was a drug dealer. While defense counsel objected to the relevance of this colloquy, the objection was overruled. Out of the presence of the jury, defense counsel clarified that the State's questioning was inadmissible character evidence of other crimes, wrongs, and acts under M. R. Evid. 404(b). The court, however, maintained that the evidence was admissible to show consciousness of guilt and as impeachment evidence.

7

¶17 At the close of evidence, the District Court charged the jury, and in doing so, the court referenced two pattern jury instructions using the word "victim." The instructions at issue had been proposed by the State without objection from defense counsel at settlement, though the defense had already been granted a standing objection to use of the word "victim" in reference to Andrade.

¶18 After deliberating for approximately six hours, the jury found Sandberg guilty on all charges. Sandberg appeals from his convictions of sexual intercourse without consent, aggravated kidnapping, and robbery.[1]

## STANDARDS OF REVIEW

¶19 We generally review a district court's discretionary rulings, including administrative rulings, evidentiary rulings, and instructions to the jury for abuse of discretion. *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, 134 P.3d 45. An abuse of discretion occurs "when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason." *State v. McLaughlin*, 2009 MT 211, ¶ 9, 351 Mont. 282, 210 P.3d 694 (citation omitted). We may reverse and remand for a new trial if the defendant made timely objections to preserve the issue and if the defendant's substantial rights were prejudiced. Sections 46-20-104(2), -701(1), MCA; *State v. Byrne*, 2021 MT 238, ¶ 20, 405 Mont. 352, 495 P.3d 440; *State v. Mathis*, 2022 MT 156, ¶ 23, 409 Mont. 348, 515 P.3d 758.

---

[1] Sandberg does not appeal his conviction of criminal possession of dangerous drugs.

**DISCUSSION**

¶20   *1. Whether Sandberg was deprived of a fair trial by repeated and pervasive use of the word "victim" in reference to the complaining witness.*

¶21   Sandberg asserts that use of the word "victim" in reference to Andrade was so pervasive throughout trial, from voir dire to jury deliberations, that he was deprived of his right to a fair trial. At the heart of Sandberg's claim is his right to be presumed innocent. "There are few principles in our criminal justice system as fundamental as the presumption of innocence." *State v. Lawrence*, 2016 MT 346, ¶ 15, 386 Mont. 86, 385 P.3d 968. "It is a bedrock, axiomatic, and elementary tenet of our criminal justice system." *Lawrence*, ¶ 10 (citation omitted). It is a fundamental right, applying to each and every defendant, and its enforcement "lies at the foundation of the administration of our criminal law." *Lawrence*, ¶ 10 (quoting *Coffin v. United States*, 156 U.S. 432, 453, 15 S. Ct. 394 (1895)). The principle of the presumption of innocence "is so foundational that we have recognized 'it cannot be evidence, nor can it be introduced in the case, for it is in the case from its inception.'" *Lawrence*, ¶ 15 (quoting *State v. De Lea*, 36 Mont. 531, 539, 93 P. 814, 817 (1908)). We have also recognized that the presumption "surrounds every person *accused* of a crime." *De Lea*, 36 Mont. at 539, 93 P. at 817 (emphasis added).

¶22   The presumption of innocence can only be overcome if jurors, based solely on the evidence introduced, reach "an abiding conviction to a moral certainty of the truth of the charge against the accused." *De Lea*, 36 Mont. at 539, 93 P. at 817. That is to say that the presumption endures with the accused through the time of their arrest, all the way through the deliberations of the jury, and it is only overcome "by evidence which satisfies the minds

9

of the jurors beyond a reasonable doubt." *De Lea*, 36 Mont. at 539, 93 P. at 817; *see Lawrence*, ¶¶ 15-22 (holding that both the Sixth Amendment to the U.S. Constitution and Article II, Section 24, to the Montana Constitution guarantee a criminal defendant the right to a fair trial by a jury, that the presumption of innocence endures throughout the deliberations of the jury, that it "is reasonable and required that both the State and defense counsel jealously guard this principle throughout the entirety of a criminal trial," and reversing defendant's conviction where the prosecution acted contrary to the defendant's presumption of innocence, "depriv[ing] the defendant of his fundamental right to a fair and impartial trial by jury").

¶23    To properly enforce the presumption of innocence, courts must remain vigilant for conditions that compromise the integrity of the fact-finding process. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 1693 (1976). Additionally, "courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle*, 425 U.S. at 503, 96 S. Ct. at 1693 (citation omitted). While the "actual impact of a particular practice on the judgment of jurors cannot always be fully determined . . . the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *Estelle*, 425 U.S. at 504, 96 S. Ct. at 1693. Reviewing courts must evaluate "the best they can" the impact on the jurors "based on reason, principle, and common human experience." *Estelle*, 425 U.S. at 504, 96 S. Ct. at 1693.

¶24    Sandberg argues that use of the word "victim" throughout trial and in reference to Andrade—the complaining witness—undermined his right to be presumed innocent.

10

However, prior to addressing the merits of Sandberg's claims, we must first consider the impact the word "victim" has on the presumption of innocence.

¶25    Black's Law Dictionary defines "victim" as "[a] person harmed by a crime, tort or other wrong doing." *Victim*, *Black's Law Dictionary* (12th ed. 2024). Thus, by its definition, "the term 'victim' is conclusive in nature and connotes a predetermination that the person referred to ha[s] in fact been wronged." *State v. Nomura*, 903 P.2d 718, 721 (Haw. Ct. App. 1995). And because "victim" is conclusive in nature, the weight of authority recognizes that its use in reference to a complaining witness is improper where the commission of a crime remains in dispute. *Jackson v. Delaware*, 600 A.2d 21, 25 (Del. 1991) ("In such cases it is incompatible with the presumption of innocence for the prosecutor to refer to the complaining witness as the 'victim,' just as it is to refer to the defendant as a 'criminal.'"); *Nomura*, 903 P.2d at 722 ("[W]e hold that reference to a complaining witness as 'the victim' in criminal jury instructions is inaccurate and misleading where the jury must yet determine from the evidence whether the complaining witness was the object of the offense and whether the complaining witness was acted upon in the manner required[.]").

¶26    Courts generally recognize that such references are particularly problematic in cases involving sexual assault and justifiable use of force, where not only a crime remains in dispute, but the allegations supporting the crime are based entirely on a complaining witness's testimony. *Utah v. Devey*, 138 P.3d 90, 95 (Utah Ct. App. 2006) ("[W]here a defendant claims that the charged crime did not actually occur, and the allegations against that defendant are based almost exclusively on the complaining witness's testimony—the

11

trial court, the State, and all witnesses should be prohibited from referring to the complaining witness as 'the victim.'"); *Vermont v. Wigg*, 889 A.2d 233, 236 (Vt. 2005) ("[W]here the commission of a crime is in dispute and the core issue is one of the complainant's credibility, it is error for a trial court to permit a police detective to refer to the complainant as the 'victim.'"); *Oregon v. Sperou*, 442 P.3d 581, 590 (Or. 2019) ("[T]he use of the word 'victim' by witnesses under the circumstances of this case amounts to vouching, and, where (as here) it is virtually impossible for a witness's use of the term to serve a legitimate, nonvouching purpose, any use of the term is categorically inadmissible."). This is because the core issue in such cases is the complaining witness's credibility and by referring to the complaining witness as a "victim," a term that is not neutral but conclusive in nature, the speaker is conveying their belief that the complaining witness was in fact the object of a crime, therefore vouching for their credibility and ultimately commenting on the weight of the evidence. *Nomura*, 903 P.2d at 721; *Veteto v. Texas*, 8 S.W.3d 805, 816-17 (Tex. App. 2000); *Wigg*, 889 A.2d at 236-37; *Talkington v. Texas*, 682 S.W.2d 674, 674-75 (Tex. App. 1984); *Sperou*, 442 P.3d at 594-95. Thus, every time the complaining witness is referred to as "victim" the province of the jury is invaded by implying the commission of a crime and the defendant's guilt while simultaneously bolstering the credibility of the complaining witness's testimony. This concern is consistent with Montana law, which has long guarded against prosecutorial commentary—explicit or implicit—that presupposes guilt or relieves the State of its burden to prove every element beyond a reasonable doubt. *See State v. Hayden*, 2008 MT 274, ¶ 28, 345 Mont. 252, 190 P.3d 1091.

¶27   Courts also recognize that while a single reference, or even two, to a complaining witness as "victim," may arguably not undermine a defendant's right to the presumption of innocence, repeated and pervasive references do. *Connecticut v. Cortes*, 885 A.2d 153, 158 n.4 (Conn. 2005) ("In the context of the present case, the jury could have drawn only one inference from ['victim's'] repeated use, namely, that the defendant had committed a crime against the complainant."); *Sperou*, 442 P.3d at 594 (holding that use of the word "victim" by witnesses was not harmless error where "the repeated references to [complaining] witnesses as 'victims' could have had a subtle but powerful effect on the jury"); *Utah v. Carrera*, 517 P.3d 440, 461 (Utah 2022) ("In this case, the statements using the term 'victim' were numerous, came from several sources . . . and unsubtly referred to [the complaining witness] as 'victim.' . . . We have little trouble concluding that these references were problematic and objectionable."); *cf. Devey*, 138 P.3d at 95 (holding that "one isolated reference" to the complaining witness as victim did not "deprive[] [the defendant] of his constitutional right to the presumption of innocence").

¶28   Further, since the speaker is conveying their belief that a crime in fact occurred, the effect of the reference on the jury will vary based on the credibility of the speaker as perceived by the jury. *See Carrera*, 517 P.3d at 460; *State v. Juarez*, 489 P.3d 231, 242 (Utah Ct. App. 2021). Thus, in addition to the frequency of references, the identity of the speaker must be considered. *Carrera*, 517 P.3d at 460; *Juarez*, 489 P.3d at 242.

¶29   The Dissent adopts the position that when the word "victim" is used in testimony by law enforcement to refer to a complaining witness, the reference is not prejudicial because "victim" is simply a term of art that is synonymous with "complaining witness."

13

Dissent, ¶¶ 80, 82. This position was first presented in *Jackson v. Delaware* by the Supreme Court of Delaware when it ruled, without support, that a prosecutor's use of the word "victim" during the direct examination of a police officer was improper but did not constitute plain error "because the term 'victim,' to law enforcement officers, is a term of art synonymous with 'complaining witness.'" *Jackson*, 600 A.2d at 24-25. Some jurisdictions have since cited *Jackson* to conclude that law enforcement's use of the word "victim" in testimony is not prejudicial simply because it is a term of art. *See Carrera*, 517 P.3d at 461; *Ohio v. Madden*, 100 N.E.3d 1203, 1210 (Ohio App. 10th Dist. 2017). However, as the Hawaii Supreme Court pointed out, "it is not evident that police officers generally use the term 'victim' to refer to a complaining witness[] in police reports or when otherwise referring to a person making a complaint against another person." *Hawaii v. Mundon*, 292 P.3d 205, 230 (Haw. 2012). Further, even if officers were to use the word "victim" synonymously with "complaining witness" pre-adjudication, law enforcement officers are trained professionals who receive extensive instruction and support on how to present testimony in conformity with legal standards and evidentiary constraints. *See* Anna Roberts, *Victims, Right?*, 42 Cardozo L. Rev. 1449, 1470 (2021); David N. Dorfman, *Proving the Lie: Litigating Police Credibility*, 26 Am. J. Crim. L. 455, 500 (1999); *see also* Missoula Police Department, Police Officer Job Description, Policy No. 1.70 (May 6, 2021) (requiring police officers to "[c]oordinate[] with prosecutors and court staff to . . . prepare testimony"). Such training and instruction routinely emphasize the distinction between investigative shorthand and impartial, courtroom appropriate language. *See* Michelle M. Heldmyer, *The Art of Law Enforcement Testimony: Fine Tuning Your*

*Skills as a Witness*, Fed. Law Enf't Training Ctrs. (April 20, 2018), https://perma.cc/F5NC-2WB3.  For example, officers may commonly refer to a defendant as "the perpetrator" or "the perp" in everyday policing, but they are trained to use neutral descriptors such as "suspect" or "defendant" when testifying in cases where guilt remains contested and the presumption of innocence remains of paramount importance.  Further, how law enforcement may use the word "victim" pre-adjudication is irrelevant to the impact the reference has on the judgment of the jurors when it is used at trial.  *See Estelle*, 425 U.S. at 504, 96 S. Ct. at 1693 (To enforce the presumption of innocence, reviewing courts must evaluate "the actual impact of [the] particular practice on the judgment of the jurors . . . based on reason, principle, and common human experience.").  If anything, law enforcement's use of the word "victim" pre-adjudication further undermines the defendant's right to be presumed innocent; a right that attaches when the defendant is first accused and continues throughout the trial until a verdict is reached.  *See De Lea*, 36 Mont. at 539, 93 P. at 817.

¶30    Accordingly, references made by law enforcement are not automatically free from prejudice, even where the reference is used synonymously with "complaining witness." Rather, "[a] police officer comes to the witness stand clothed with the authority of the state." *Briscoe v. LaHue*, 460 U.S. 325, 365, 103 S. Ct. 1108, 1131 (1983) (Marshall, J., with Blackmun, J. dissenting in part).  "His official status gives him credibility and creates a far greater potential for harm than exists when the average citizen testifies." *Briscoe*, 460 U.S. at 365, 103 S. Ct. at 1131.  Thus, "[w]hen the witness is a police officer, use of the term 'victim' is even more concerning, because it may signal to the jury that a person

15

with expertise in identifying victims believes the complaining witness." *Oregon v. Kehoe*, 560 P.3d 774, 777-78 (Or. 2024) (citation omitted).

¶31    Courts have also recognized that use of the word "victim" in reference to a complaining witness is particularly prejudicial when made by a trial court because it gives an impression of partiality. *California v. Williams*, 17 Cal. 142, 147-48 (Cal. 1860); *Carrera*, 517 P.3d at 460; *Talkington*, 682 S.W.2d at 674-75; *Cortes*, 885 A.2d at 249 n.4. This concern was first articulated by the California Supreme Court in 1860, when in *California v. Williams* the court considered whether a trial judge erred by referring to the complaining witness as "the victim" while charging the jury in a case where the defendant argued self-defense. *Williams*, 17 Cal. at 146. The court stressed that a trial court, as a neutral body, has a duty to be cautious about indirectly influencing the jury, and that use of the word "victim" while charging the jury is nearly equivalent in its effect to the court characterizing the defendant as guilty. *Williams*, 17 Cal. at 147-48.[2] Specifically, the court explained:

> The word *victim,* in the connection in which it appears, is an unguarded expression, calculated, though doubtless unintentionally, to create prejudice against the accused. It seems to assume that the deceased was wrongfully killed, when the very issue was as to the character of the killing. We are not disposed to criticise language very closely in order to reverse a judgment of this sort, but it is apparent that in a case of conflicting proofs, even an equivocal expression coming from the Judge, may be fatal to the prisoner. When the deceased is referred to as "a victim," the impression is naturally created that some unlawful power or dominion had been exerted over his person. And it was nearly equivalent, in effect, to an expression characterizing the defendant as a criminal. The Court should not, directly or indirectly, assume the guilt of the accused, nor employ equivocal phrases

---

[2] Here, the District Court recognized that, given the court's stature, its use of "victim" to describe the complaining witness would be improper.

16

which may leave such an impression. The experience of every lawyer shows the readiness with which a jury frequently catch at intimations of the Court, and the great deference which they pay to the opinions and suggestions of the presiding Judge, especially in a closely balanced case, when they can thus shift the responsibility of a decision of the issue from themselves to the Court. A word, a look, or a tone may sometimes, in such cases, be of great or even controlling influence.

*Williams*, 17 Cal. at 147-48. While *Williams* was ultimately decided on other grounds, appellate courts have since recognized that a trial court's reference to a complaining witness as "victim" while charging a jury is improper, with some courts holding that it constitutes reversible error where witness credibility remains a core issue. *Talkington*, 682 S.W. 2d at 75 ("We hold that to refer in the court's charge to the complainant as the 'victim' when the issue is whether or not she consented to sexual intercourse, constitutes reversible error."); *New York v. Davis*, 423 N.Y.S.2d 229, 230 (N.Y. App. Div. 2d Dept. 1979) (holding that use of the words "victim" and "perpetrator" in charging the jury "patently deprived the defendant of a fair trial" where "defendant's culpability and criminal liability were issues solely to be resolved by the jury without any indication of the court's evaluation of evidence"); *see also Juarez*, 489 P.3d at 242 ("statements by a trial court are perhaps most concerning, given that juries tend to view statements by the court as neutral and authoritative"); *Carrera*, 517 P.3d at 460 (explaining that the Utah Supreme Court considers a trial court's use of the word "victim" particularly serious because it can give the jury an impression of partiality).

¶32 We find these authorities persuasive and, with these considerations in mind, we turn to the merits of Sandberg's claims by examining the nature of the case and the context of the references at issue.

17

¶33 However, before turning to the prevalence of the use of the term "victim" throughout the trial, we must first address the State's argument and the Dissent's conclusion that Sandberg failed to preserve his claim of error as to use of the word "victim" in the jury instructions by failing to object to the instructions at the time of settlement, as required by § 46-16-410(3), MCA. While the Dissent is correct in that this Court generally will not review jury instructions where the party asserting error did not object to the instructions at the time they were proposed (Dissent, ¶ 102) under the circumstances of this case, we conclude that the unlimited standing objection regarding use of the word "victim" in reference to Andrade extended to the jury instructions and sufficiently preserved his claim of error for the purpose of § 46-16-410, MCA.

¶34 The Dissent asserts that since the settlement of instructions is a separate part of the trial, allowing a standing evidentiary objection to stand during settlement of instructions is contrary to Montana law governing trial process. Dissent, ¶ 104. This assertion is not persuasive given the particular circumstances of this case. In general, the purpose of the contemporaneous-objection rule is to prevent sandbagging and to afford the trial court a meaningful opportunity to correct alleged error, not to require ritualistic repetition once the legal issue has been clearly identified, understood, and ruled upon. Accordingly, we have recognized that "[o]bjections to jury instructions proposed by the opposing party serve the same functions as evidentiary objections." *State v. Grimes*, 1999 MT 145, ¶ 39, 295 Mont. 22, 982 P.2d 1037. Like evidentiary objections, any objection to a claim of error in jury instructions functions to (1) signify an issue of law and (2) provide notice to the terms of that issue. *Grimes*, ¶ 39. If both of these functions are accomplished, we have recognized

18

that an objection may be sufficient for purposes of § 46-16-410, MCA. *See Grimes*, ¶ 39. Although Sandberg's objection encompassed evidentiary presentation, it clearly went beyond that, as the District Court acknowledged in granting it.

¶35 Sandberg's standing objection was narrow and specific—it opposed any reference to Andrade as a "victim." It also raised a clear issue of law—whether a complaining witness may be referred to as a "victim" where a crime remains in dispute—and it outlined the nature of Sandberg's contention—that any references to Andrade as a "victim," evidentiary or otherwise, would presuppose Sandberg's guilt and impermissibly undermine his right to be presumed innocent.

¶36 Here, the District Court granted Sandberg a standing objection without limitations. While the court ultimately abused its discretion in overruling the evidentiary nature of the objection—concluding the State's references were not resulting in any undue prejudice or violation of the presumption of innocence—it did not limit application of the standing objection to the evidentiary phase of trial or exclude application to the jury instructions or the court's own use. To the contrary, the District Court expressly stated, "[c]ertainly to the degree that I were to refer Miss Andrade as a victim, I agree, that it would be highly problematic." While Sandberg did not object to the instructions using the word "victim" in reference to Andrade at settlement, as generally required under § 46-16-410(3), MCA, the function of the contemporaneous objection requirement was nonetheless served by Sandberg's standing objection. The District Court knew Sandberg contested any and all references to Andrade as a "victim" through the standing objection it granted just a few hours before the settlement of instructions. Further, the basis of his claim of error was

19

obvious from the instruction in light of Sandberg's standing objection and the record is certainly adequate for this Court to address the issue on appeal. To require Sandberg to have made further objection would merely create redundancy. Accordingly, under these circumstances, Sandberg's claim of error as to the jury instructions was sufficiently preserved by his standing objection for purposes of § 46-16-410, MCA.

¶37 As to the nature of this case, it is undisputed that at the time of Sandberg's trial, the commission of a crime remained in dispute, the charges of which were premised almost entirely on Andrade's testimony. It is also undisputed that Sandberg's defense was premised on the argument that a crime never occurred; that Andrade voluntarily came and remained in the tent and engaged in consensual oral sex. Accordingly, the nature of this case was such that any use of the word "victim" in reference to the complaining witness was generally improper.

¶38 Turning to the prevalence of the references at issue, in the two days prior to being charged by the District Court, the jury heard Andrade referred to as "victim" 11 times, from four sources: the prosecutor, two uniformed police officers, and a serologist. It also heard the District Court overrule several of Sandberg's objections to the characterization of Andrade as a victim. While some of these references were made prior to any objection, every reference to Andrade as a "victim" is relevant to the context of the word's use in Sandberg's preserved claims given the pervasiveness of the references throughout trial. *See Anderson v. BNSF Ry.*, 2015 MT 240, ¶ 78, 380 Mont. 319, 354 P.3d 1248 ("Repeated improper statements create cumulative prejudice, and we accordingly view them collectively rather than individually.").

20

¶39 The first reference to Andrade as a "victim" occurred during voir dire, when the prosecutor raised a hypothetical question by stating, "Let's talk about a child sex abuse case. This is not a child sex abuse case. This is an adult victim in this case." Then in the first sentence of opening argument, before the jury heard any evidence, the prosecutor stated, "Kevin Sandberg had been looking for the victim in this case, Tammany Andrade, for months." Shortly after, the prosecutor went on to state that "Mr. Sandberg and the victim Miss Andrade had known each other for about a year . . . ." The prosecutor's references to Andrade as "victim" in these instances serves no purpose other than to express the prosecutor's personal opinion and improperly vouch for Andrade's credibility. This Court has consistently recognized that "a prosecutor's expression of guilt invades the province of the jury and is a usurpation of its function to declare the guilt or innocence of an accused." *Hayden*, ¶ 28 (quoting *State v. Stinger*, 271 Mont. 367, 381, 897 P.2d 1063, 1071-72 (1995)). Further, the prosecutor's references risk that "the jury may simply adopt the prosecutor's views instead of exercising their own independent judgment as to the conclusions to be drawn from the [evidence]." *Hayden*, ¶ 28 (quoting *Stinger*, 271 Mont. at 381, 897 P.2d at 1071-72). This is especially true here, where the prosecutor communicated their belief of guilt before any evidence was presented, impermissibly undermining the presumption of innocence and invading the province of the jury.

¶40 Then, on the second day of trial, the jury heard testimony from Officer Harrington and Officer Smith. "Clothed in the authority of the state," the officers referred to Andrade as a "victim" six times. *See Briscoe*, 460 U.S. at 365, 103 S. Ct. at 1131. "Based on reason, principle, and common human experience," a jury is likely to infer from these references

21

that the officers believed Andrade to be a victim and Sandberg to be guilty. *See Estelle*, 425 U.S. at 504, 96 S. Ct. at 1693. Further, because the jury is likely to view the two officers as experts in investigating crimes and identifying victims, the jury is likely to infer Sandberg's actual guilt merely from the officers' characterization of Andrade as a "victim."

¶41 Then the jury heard the word "victim" used by the serologist in reference to Andrade's sexual assault kit. While the serologist's use was potentially rooted in pre-adjudicatory procedure, the reference insinuated the serologist's belief that Andrade was in fact the victim of a crime. Surely had Sandberg's DNA kit been labeled "perpetrator" or "rapist" this Court would take issue. Further, the jury is likely to give the serologist additional credibility as an expert in all matters of blood, semen, and DNA analysis. Thus, there is a significant possibility of the jury inferring actual guilt not because of the weight of the evidence, but because of the serologist's belief that Andrade was in fact a victim and therefore, Sandberg to be in fact guilty.

¶42 In addition to these references, the District Court overruled defense counsel's objections to the characterization of Andrade as a "victim" three times before granting Sandberg an unlimited standing objection. These rulings are significant because this case hinged on whether the jury believed Andrade or Sandberg and thus, just "a word, a look, or a tone" from the court "may be of great or even controlling influence." *See Williams*, 17 Cal. at 148. In overruling the objections, the court inadvertently communicated to the jury that the State's characterization of Andrade as a victim was permissible and appropriate, signaling a judicial endorsement of the prosecution's theory to the jury and implying the District Court's belief that Andrade was in fact the victim of a crime.

¶43    Then, on the final day of trial, the District Court referenced two jury instructions that used the word "victim" in reference to the complaining witness. First, the District Court charged the jury with instructions that provided, "Evidence of failure to make a timely complaint or immediate outcry does not raise any presumption as to the credibility of the victim. Resistance by the victim is not required to show lack of consent." Additionally, the District Court charged the jury with instructions for aggravated kidnapping which included "terrorize the victim" as an element.

¶44    While these instructions reflected statutory language that may be considered neutral in isolated circumstances, in this case, where the commission of a crime remained in dispute and the State's allegations were premised entirely on the complaining witness's testimony, and where the word "victim" had already been used pervasively in direct reference to Andrade, the language became conclusive, "connotat[ing] a predetermination that the person referred to had in fact been wronged." *See Nomura*, 903 P.3d at 721. Thus, the District Court once again communicated to the jury what the jury was likely to perceive as the court's belief in Andrade's credibility and Sandberg's guilt despite its own acknowledgement that it would be inappropriate for the court to refer to Andrade as a "victim." Further, because a jury is likely to pay "great deference to the opinions and suggestions of a presiding judge," it is likely that the jury proceeded to infer Sandberg's actual guilt not solely on the evidence before it, but on the judge's characterization of Andrade as the victim and the resultant conclusion of Sandberg as the guilty perpetrator. Indeed, the judge acknowledged this himself and noted, "[c]ertainly to the degree that I were to refer Miss Andrade as a victim, I agree, that it would be highly problematic." Here,

23

it was not only problematic that the judge defined Andrade as the victim, but it was the last thing the District Court instructed the jury on before it deliberated.

¶45    In *Talkington*, a Texas court of appeals considered whether a trial court improperly commented on the weight of the evidence in a sexual assault case when, in reading the charge to the jury, the trial judge referred to the accuser as the "victim" multiple times. *Talkington*, 682 S.W.2d at 674-75.  Like Sandberg, the defendant did not deny having sexual intercourse with the complaining witness but argued that the intercourse had been consensual.  *Talkington*, 682 S.W.2d at 675.  Thus, the sole issue was "whether the complainant was truly a 'victim' or a willing participant."  *Talkington*, 682 S.W.2d at 675.  The court went on to hold that when consent is the sole issue, referring to a complainant as a "victim" while charging the jury constitutes reversible error.  *Talkington*, 682 S.W.2d at 675.  Citing Black's Law Dictionary's definition of "victim," the court reasoned that "if the complainant consented to the sexual intercourse, as testified by [the defendant], she was not the object of a crime, and she was not a 'victim.'" *Talkington*, 682 S.W.2d at 675.  Thus, by referring to the complaining witness as "victim," the trial court commented on the weight of the evidence, invading the province of the jury.  *Talkington*, 682 S.W.2d at 675.

¶46    Here, like *Talkington*, the sole issue is consent.  Sandberg never denied having sexual intercourse with Andrade, rather, the entire theory of his defense was that she consented and was therefore not the object of a crime, and thus, not a "victim."  The Dissent attempts to present the repeated references to Andrade as the victim here as less egregious than in *Talkington* as the court ultimately instructed the jury its remarks were not intended

24

to express the court's opinion. Dissent, ¶ 108. However, here, unlike in *Talkington*, by the time the District Court charged the jury, pervasive use of the word "victim" in reference to Andrade had already occurred. While the instructions did not reflect those in *Talkington* by expressly stating "Andrade, hereinafter called victim," there was no need to; the jury already associated Andrade with the word "victim." Thus, just as in *Talkington*, the District Court commented on the weight of evidence when it charged the jury and the jury was likely to infer Sandberg's guilt from the court's characterization of Andrade as a "victim."

¶47 The pervasiveness of these references did not merely present a risk of prejudice, as the Dissent concludes, but pre-adjudicated the commission of a crime in the jury's presence, a crime for which only Sandberg could be responsible for. Jurors cannot unhear the premise that a victim exists, and this Court cannot fully reconstruct the weight that a jury will attribute to repeated references given their "subtle but powerful effect." *See Sperou*, 442 P.3d at 594. Further, even if the inherent prejudice resulting from such pervasive use could be remedied by a curative instruction, the District Court failed to do so. Rather, the District Court affirmatively reinforced the premise that a crime in fact occurred in its charge to the jury, and in doing so, the court did not just fail to cure the prejudice, it institutionalized it, collapsing the presumption of innocence and transforming the jury's task from determining whether a crime occurred into deciding only whether the one person who could be responsible for the crime—Sandberg—was in fact responsible.

¶48 The Dissent nonetheless concludes reversal is not warranted because Sandberg's credibility was undermined by his own statements and trial testimony. In doing so, the Dissent disregards the presumption of innocence as a principle so foundational to our

25

criminal justice system that "it cannot be evidence, nor can it be introduced in the case, for it is in the case from its inception." *See Lawrence*, ¶ 15 (quoting *De Lea*, 36 Mont. at 539, 93 P. at 817). A trial founded on the presumption of innocence simply cannot coexist with a trial conducted under the premise that a victim in fact exists where the trial itself is to determine the existence of a crime. There is a logical incompatibility between these premises; one must give way to the other, and here, the presumption of innocence must prevail.

¶49 Given the nature of this case and the context of the references, the District Court abused its discretion in overruling Sandberg's objections regarding use of the word "victim." Accordingly, we must consider whether the District Court's abuse of discretion warrants reversal—that is, whether the error was harmless.

¶50 Where an error undermines the presumption of innocence itself, harmless error review must be conducted with particular rigor, because the error strikes at the framework within which the jury evaluates all evidence. *See Sullivan v. Louisiana*, 508 U.S. 275, 281-82, 113 S. Ct. 2078, 2082-83 (1993) (holding that a defendant is denied their jury-trial guarantee when an error "vitiates *all* the jury's findings," such that a reviewing court "can only engage in pure speculation—its view of what a reasonable jury would have done"). Our harmless error analysis does not ask whether evidence might have supported the verdict notwithstanding the error, but whether the verdict was surely unattributed to the error. *State v. Van Kirk*, 2001 MT 184, ¶ 47, 306 Mont. 215, 32 P.3d 215 ("to prove that trial error was harmless, the State must demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction"). Here, given that

26

the District Court's error calls into question the fundamental fairness of Sandberg's trial, we cannot conclude that the State satisfied its burden in demonstrating "no reasonable possibility" that the pervasive references to Andrade as a "victim" did not contribute to Sandberg's conviction. Thus, we conclude the District Court's error was not harmless.

¶51 Accordingly, while the District Court's error occurred during the presentation of the case at trial, the pervasiveness of the error nonetheless undermined the fundamental framework of the trial. The references were a continuing influence on the jury, much like prison attire or shackles, and created an unacceptable risk of impermissible factors coming into play. *See Estelle*, 425 U.S. at 504, 96 S. Ct. at 1693; *State v. Hartsoe*, 2011 MT 188, ¶ 31, 361 Mont. 305, 258 P.3d 428. Conducting the trial on the premise that a crime in fact occurred—a crime for which only Sandberg could be responsible for—not only deprived Sandberg of his right to be presumed innocent, but it deprived him of his right to a fair trial and reversal for a new trial is mandated.

¶52 *2. Whether the District Court abused its discretion in admitting Sandberg's statements to his girlfriend requesting she "wipe" his phone over Sandberg's Rule 402 and Rule 404(b) objections.*

¶53 Sandberg asserts that the District Court abused its discretion when it permitted the State to introduce evidence of Sandberg's attempt to have with girlfriend "wipe" his phone and when it allowed the prosecutor to pursue a line of questioning about Sandberg's attempt for the purpose of introducing inadmissible character evidence over Sandberg's Rule 402 and 404(b) objections. The State contends that the evidence was relevant and admissible to show consciousness of guilt, as well as for the purpose of impeaching Sandberg, and thus, does not implicate Rule 404(b).

27

¶54 However, even if Sandberg's request to "wipe" his phone was somehow relevant, we conclude the prosecutor's line of questioning violated Rule 404(b) due to the propensity inferences raised and the undue prejudice that resulted. Both the State and Sandberg recognized that witness credibility was central to the outcome of this case. Given the bolstering effect the inadmissible evidence had on the State's theory of the case—that is, that consent could not be inferred by Andrade as Sandberg was "a pissed off drug dealer," "not a drug dealer that you can mess with"—our harmless error analysis demands reversal.

¶55 Evidence must be relevant to be admissible. M. R. Evid. 402. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more [or less] probable than it would be without the evidence." M. R. Evid. 401. Additionally, evidence may be considered admissible under the transaction rule, codified in § 26-1-103, MCA, if it is "relevant as part of the transaction" in dispute. *State v. Detonancour*, 2001 MT 213, ¶ 30, 306 Mont. 389, 34 P.3d 487.

¶56 Section 26-1-103, MCA, provides, "[w]here [a] declaration, act, or omission forms part of a transaction which is itself the fact in dispute or evidence of that fact, such declaration, act, or omission is evidence as part of the transaction." However, "[e]vidence admitted pursuant to the rule must be 'inextricably linked or intertwined' with the defendant's criminal conduct and explain a fact in dispute, which makes the evidence 'relevant to provide a comprehensive and complete picture' of the defendant's criminal conduct." *State v. Loera*, 2025 MT 84, ¶ 17, 421 Mont. 390, 567 P.3d 951 (quoting *State v. Lake*, 2022 MT 28, ¶ 45, 407 Mont. 350, 503 P.3d 247). In a criminal case, the fact in

28

dispute is "whether the defendant committed all the elements of the charged offense." *State v. Guill*, 2010 MT 69, ¶ 33, 355 Mont. 490, 228 P.3d 1152 (citation omitted). Thus, evidence that is inextricably linked to, or explanatory of, an element of the charged offense, such as mental state, is relevant for transaction rule purposes, including evidence of acts subsequent to the charged offenses. *Detonancour*, ¶ 29. Recognizing that when evidence tends to show consciousness of guilt it "tends to prove the commission of a crime and the defendant's responsibility for it," this Court has held that if a defendant's subsequent acts demonstrate a consciousness of guilt ***as to the crime charged***, those acts are "intertwined with the evidence of the proof of the crime itself" and therefore relevant and admissible under the transaction rule.[3] *State v. Moore*, 254 Mont. 241, 245-46, 836 P.2d 604, 607 (1992).

¶57 In *Moore,* we considered the admissibility of a defendant's acts of concealment subsequent to the crime charged. *Moore*, 254 Mont. at 244-46, 836 P.2d at 606-07. The defendant, Moore, had been charged with deliberate homicide and tampering with physical evidence. *Moore*, 254 Mont. at 243, 836 P.2d at 605. The district court had severed the tampering charge due to concerns of prejudice, but the State still sought to introduce subsequent acts relevant to the tampering charge at the homicide trial on the basis that the acts were probative of Moore's consciousness of guilt as to the homicide charge. *Moore*,

---

[3] *Moore* does not expressly reference the "transaction rule" or cite to § 26-1-103, MCA, but its language and reasoning reflect the doctrine in substance and this Court has repeatedly cited *Moore* for its holding pursuant to the transaction rule. *See State v. Hansen*, 1999 MT 253, ¶ 77, 296 Mont. 282, 989 P.2d 338; *State v. Stout*, 2010 MT 137, ¶ 40, 356 Mont. 468, 237 P.3d 37; *State v. Derbyshire*, 2009 MT 27, ¶ 32, 349 Mont. 114, 201 P.3d 811; *State v. Hayworth*, 1998 MT 158, ¶¶ 31-32, 289 Mont. 433, 964 P.2d 1.

254 Mont. at 245, 836 P.2d at 606. Specifically, the State sought to introduce evidence that in the days following the murder, the defendant "cleaned blood from [his] camper, discarded bullets and carpet, covered and repaired bullet holes, [and] spilled battery acid . . . to cover or clean material." *Moore*, 254 Mont. at 244, 836 P.2d at 606. The district court suppressed the evidence. *Moore*, 254 Mont. at 244, 836 P.2d at 607. This Court reversed, finding the defendant's acts "inseparably related to the alleged criminal act," and "tended to prove the commission of the crime and the defendant's responsibility for it." *Moore*, 254 Mont. at 245-46, 836 P.2d at 607.

¶58    However, this Court has also recognized that evidence of flight or concealment "tends to be only marginally probative as to the ultimate issue of guilt or innocence." *State v. Hall*, 1999 MT 297, ¶ 45, 297 Mont. 111, 991 P.2d 929 (citations omitted). The U.S. Supreme Court has also "consistently doubted the probative value [of flight and concealment evidence] in criminal trials," (*Wong Sun v. United States*, 371 U.S. 471, 483 n.10, 83 S. Ct. 407, 415 (1963)), "since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses" (*Alberty v. United States*, 162 U.S. 499, 511, 16 S. Ct. 864, 868 (1896)). Inferences drawn from flight or concealment must be approached with restraint and grounded in context, because such conduct is often ambiguous, leaving too much room for speculation to be considered probative. *See Alberty*, 162 U.S. at 511, 16 S. Ct. 868; *Bailey v. United States*, 416 F.2d 1110, 1115-16 (D.C. Cir. 1969); *United States v. Myers*, 550 F.2d 1036, 1050 (5th Cir. 1977).

¶59     Accordingly, the probative value of conduct pertaining to flight or concealment as circumstantial evidence of guilt "depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight [or concealment]; (2) from flight [or concealment] to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged"; which ultimately leads to (4) an inference of the defendant's actual guilt as to the crime charged. *Myers*, 550 F.2d at 1049.

¶60     In *Myers*, the Fifth Circuit considered whether a jury instruction regarding flight and an inference of guilt was proper. *Myers*, 550 F.2d at 1048-50. The defendant faced charges related to a Florida bank robbery and evidence of his subsequent flight from law enforcement was introduced to show his consciousness of guilt. *Myers*, 550 F.2d at 1048-50. However, because the defendant had also robbed a Pennsylvania bank in the time between the Florida robbery and the defendant's flight, the Fifth Circuit determined that the flight evidence should have been excluded in its entirety. *Myers*, 550 F.2d at 1050. Specifically, the court recognized that "the hypothesis that [the defendant] fled solely because he felt guilty about the Pennsylvania robbery [could not] be ruled out." *Myers*, 550 F.2d at 1050. The court explained that "[w]ithout knowing whether [the defendant] committed the Florida robbery it is impossible to say whether the [] flight resulted from feelings of guilt attributable to the Florida and Pennsylvania robberies or from circumstances of guilt about the Pennsylvania robbery alone." *Myers*, 550 F.2d at 1050. Accordingly, the court concluded that even if flight could be inferred from the defendant's conduct, no inference of consciousness of guilt as to the crime charged—the Florida robbery—could be drawn. *Myers*, 550 F.2d at 1050.

¶61 While this Court has not expressly adopted the four inferences test articulated in *Myers*, its logic is fully consistent with, and illustrative of, the limits inherent to the transaction rule; if the defendant's conduct does not support a consciousness of guilt *as to the crime charged*, the conduct is not "inextricably linked to or intertwined with" the crime charged, and therefore is not admissible under § 26-1-103, MCA. *See Detonancour*, ¶ 29.

¶62 Here, the first two inferences can be drawn from Sandberg's conduct. While a person may have innocent reasons for deleting data from their phone, as Sandberg argues, given the timing of Sandberg's request and his acknowledgement that he would otherwise be "fucked," a consciousness of guilt can be inferred from Sandberg's attempt at concealment. However, like the defendant in *Myers*, Sandberg's conduct is ambiguous as to the third inference. It cannot be discerned whether Sandberg acted out of consciousness of guilt as to any of the charged offenses, or out of a consciousness of guilt as to uncharged drug distribution offenses. The State made no attempts at trial to establish the inference of consciousness of guilt as to the charged offenses. Rather, the State used the conversation between Sandberg and his girlfriend to infer Sandberg's consciousness of guilt as to being a drug dealer. To be sure, the State immediately pursued a line of questioning that included the following exchange:

Q:     And you know that drug dealers often use their phone in order to engage in drug transactions; is that fair to say?

A:     That's fair to say.

Q:     And so your phone being wiped, were you of that ilk would remove any of that evidence; is that fair to say?

A:     When you wipe your phone you lose everything.

32

¶63   Accordingly, because the inference of consciousness of guilt cannot be drawn as to the charged offenses, the evidence is not probative of consciousness of guilt and is therefore not relevant under the transaction rule. Further, the State's line of questioning is nonetheless barred under Rule 404(b).

¶64   Rule 404 governs the admission of character evidence, which is "evidence regarding a person's general personality traits or propensities, whether of a praiseworthy or blameworthy nature." *State v. Pelletier*, 2020 MT 249, ¶ 15, 401 Mont. 454, 473 P.3d 991 (cleaned up) (quoting *Black's Law Dictionary* (11th ed. Westlaw 2019)). Rule 404(a) generally prohibits the use of character evidence for the purpose of proving action in conformity therewith on a particular occasion, except in narrow statutorily defined circumstances. *Pelletier*, ¶ 15. Rule 404(b) specifically provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, "Rule 404(b) authorizes admission of other acts evidence when relevant for other non-propensity purposes." *Lake*, ¶ 27. The transaction rule is one such statutory non-propensity purpose for which "other acts" evidence may be admitted as an exception to Rule 404(b)'s general exclusion. *Lake*, ¶ 46. However, the transaction rule is not a conduit to admit evidence that would otherwise be excluded by Rule 404(b). *Lake*, ¶ 46; *State v. Haithcox*, 2019 MT 201, ¶ 17, 397 Mont. 103, 447 P.3d 452.

¶65   Relying on *Moore*, the Dissent concludes that evidence of concealment does not violate Rule 404(b) when admitted to prove consciousness of guilt. Dissent, ¶ 118.

33

However, while the concealment evidence presented in *Moore* was admitted pursuant to the transaction rule, we have since "endeavored to cabin application of the transaction rule to prevent it from overthrowing the Rule 404(b) exclusion of other-bad-acts evidence." *Guill*, ¶ 26 (citation omitted). Specifically, we have held that the rule should not be permitted to admit propensity evidence that would otherwise be excluded by Rule 404(b). *State v. Berosik*, 2009 MT 260, ¶ 46, 352 Mont. 16, 214 P.3d 776. We have also held that evidence admissible under the transaction rule remains subject to fact-specific balancing under Rule 403. *State v. Buckles*, 2018 MT 150, ¶ 13, 391 Mont. 511, 420 P.3d 511.

¶66 Here, even if we assume that Sandberg's attempt to have his girlfriend wipe his phone was relevant and admissible pursuant to the transaction rule, the State's line of questioning violated Rule 404(b) because it introduced character evidence solely for propensity purposes. That is, the State used evidence of Sandberg's subsequent act to insinuate that Sandberg's conduct was consistent with that of "a pissed off drug dealer" and thus, inferred that he was in fact a very bad man unworthy of credibility. This is an improper propensity inference prohibited by Rule 404(b). Further, this evidence is not admissible under 404(b) because it is unduly prejudicial.

¶67 This Court has "long recognized and cautioned that, to prevent permissible uses from swallowing the general rule, trial courts '*must ensure* that the use' of prior bad acts evidence under Rule 404(b) is 'clearly justified and *carefully limited*.'" *Lake*, ¶ 44 (quoting *State v. Madplume*, 2017 MT 40, ¶ 23, 386 Mont. 368, 390 P.3d 142). "Implicit within [Rule 404(b)] is the assumption that evidence of propensity is of slight probative value and often prejudicial." *Harrell v. Farmers Ed. Co-op Union of Am.*, 2013 MT 367, ¶ 66,

34

373 Mont. 92, 314 P.3d 920. Therefore, "[i]f evidence meets one of the alternative purposes, the trial court *must* consider its probative value in light of the purpose for which it is offered and balance the probative value of the evidence against its potential for prejudice." *Harrell*, ¶ 66 (emphasis added). "It is the rule that both trial courts and this Court are obligated to balance carefully the relative probative value of the evidence of other [acts] against the prejudice inherent in this type of evidence in light of the actual need to introduce such evidence." *State v. Just*, 184 Mont. 262, 268, 602 P.2d 957, 963 (1979), *overruled on other grounds by State v. Dist. Ct. of Eighteenth Jud. Dist.* (*Salvagni*), 2010 MT 263, 358 Mont. 325, 246 P.3d 415. Consequently, Rule 403's limiting factors were expressly included in the Just Rule and the Modified Just Rule, the four element test Montana courts previously used to determine the admissibility of other acts evidence. *Just*, 184 Mont. at 268, 60 P.2d at 963; *State v. Matt*, 249 Mont. 136, 142, 814 P.2d 52, 56 (1991). While we overruled the notice requirements set forth by the Modified Just Rule in *Salvagni*, our holding did not remove the long-standing protection Montana has afforded defendants in applying Rule 403's limiting factors under Rule 404(b). *See Salvagni*, ¶ 49 ("We hold that this disclosure requirement is sufficient to ensure that the defendant receives notice of any 'other crimes, wrongs, or acts' evidence.").

¶68 Accordingly, evidence subject to Rule 404(b) that is relevant for non-propensity purposes is nonetheless subject to exclusion if its probative value is substantially outweighed by the danger of unfair prejudice. Contrary to the Dissent's conclusion (Dissent, ¶ 117), Sandberg's claim of error under Rule 403 was preserved by his Rule 404(b) objection. *See Harrell*, ¶ 66.

35

¶69     We have recognized that "[t]he need and demand for careful consideration and application of Rule 403 is particularly critical in the case of other bad acts evidence" because, even when admissible for a non-propensity purpose, "such evidence is inherently prejudicial insofar that it . . . has the tendency to impugn the character of the accused based on matters not directly at issue, thus arousing or provoking hostility against [the accused] without regard to its probative value," thus "inviting or tempting the jury to find guilt on an improper basis." *Lake*, ¶ 32.

¶70     Here, the evidence of Sandberg's subsequent act and the propensity evidence elicited by the State was not carefully limited to avoid its manifestly inherent risk of unfair prejudice. As discussed, Sandberg's subsequent act drew an inference of consciousness of guilt, but that inference cannot be drawn as to the charged offenses. Thus, introducing this evidence risked misapprehension by the jury. Specifically, it risked the jury inferring Sandberg's guilt as to the charged offenses simply because Sandberg was trying to conceal *something* unrelated to the charged offenses. Further, the State's use of the evidence to draw propensity inferences carried significant danger that the jury would find Sandberg guilty on account of him being an unsavory, violent person—a pissed off methamphetamine dealer not to be messed with—thus, arousing the jury's hostility without regard to the evidence's probative value. It was undisputed that Andrade stole something of value from Sandberg and that Sandberg demanded repayment; what Andrade actually stole—whether cash or drugs—was not probative of Andrade's consent. Thus, even if the evidence was admissible under Rule 404(b) for non-propensity purposes, the District Court erroneously allowed the State to reference and elicit testimony regarding Sandberg's

36

concealment attempt in a manner that was unfairly prejudicial under the circumstances of this case.

¶71 The State, however, maintains that even if the evidence was not admissible to establish consciousness of guilt, the prosecutor's line of questioning was nonetheless proper impeachment testimony. "Impeachment evidence is 'evidence tending to cast doubt' on the credibility of a witness or their testimony." *State v. McGhee*, 2021 MT 193, ¶ 17, 405 Mont. 121, 493 P.3d 518 (quoting *Pelletier*, ¶ 14). However, "only the defendant is allowed to make the precarious decision to put [their] character at issue." *State v. Gowan*, 2000 MT 277, ¶ 23, 302 Mont. 127, 13 P.3d 376.

¶72 Pursuant to Rule 607(a), other acts evidence may be used to impeach a witness by "attacking 'the credibility of a witness' by cross-examination or extrinsic evidence offered 'to prove that a fact which the witness asserted or relied upon in [his or her] testimony is not true.'" *McGhee*, ¶ 19 (quoting *State v. Passmore*, 2010 MT 34, ¶ 59, 355 Mont. 187, 225 P.3d 1229). This is often referred to as impeachment by contradiction. Additionally, Rule 404(a)(1) authorizes the admission of otherwise inadmissible other acts evidence by cross-examination or extrinsic evidence when the evidence is relevant to rebut evidence that the defendant has a pertinent good character trait inconsistent with the alleged offense, and which is usually elicited "for the purpose of supporting an inference that he or she is not guilty." *McGhee*, ¶ 20 (quoting *Pelletier*, ¶ 16). Accordingly, if the defense presents or elicits good character evidence pertinent to the charged offense, it may "open the door to cross-examination or extrinsic evidence regarding other prior bad acts to the contrary." *McGhee*, ¶ 20. And finally, distinct from impeachment by contradiction and Rule

37

404(a)(1), "a defendant may, by opening statement or elicited witness testimony, further 'open the door' to cross-examination or extrinsic evidence regarding otherwise inadmissible other acts evidence . . . for the purpose of explaining or correcting a pertinent false impression or assertion, or rebutting an attack on the credibility of another witness." *McGhee*, ¶ 21.

¶73 Here, the State exceeded the scope of cross-examination by introducing propensity evidence that did not contradict or rebut Sandberg's testimony. Sandberg's attempt to wipe his phone was first introduced to impeach Sandberg's claim that he did not stand in the way of the investigation. While this was proper impeachment by contradiction, the State then used the concealment evidence to pursue a line of questioning for the purpose of establishing Sandberg's propensity to deal drugs. This propensity inference cannot be used to impeach by contradiction because Sandberg never denied dealing drugs in his earlier testimony. Further, while Sandberg testified that he helped residents of the Island, a propensity to deal drugs does not counter a propensity of helpfulness. Though the Dissent concludes that the cross-examination was permissible to correct the false impression that Andrade had stolen money from Sandberg, rather than drugs (Dissent, ¶¶ 121-22), this is irrelevant to the charged offense and not probative of any material fact. Thus, the character evidence elicited by the State's questioning on cross-examination is not admissible for a valid impeachment purpose.

¶74 Based on the foregoing analysis, the District Court erred in admitting evidence of Sandberg's subsequent acts. Further, our review of the record demonstrates that the error was not harmless.

38

¶75 As previously discussed, to determine whether a trial error is harmless, a qualitative assessment of the cumulative evidence is necessary. *State v. Stewart*, 2012 MT 317, ¶ 45, 367 Mont. 503, 291 P.3d 1187. Where tainted evidence was admitted to prove an element of a charged offense, "the State must direct us to admissible evidence that proves the same facts as the tainted evidence and demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction." *Buckles*, ¶ 18. Notably, the harmless error inquiry does not require the Court "to definitely say whether or not the tainted evidence *actually* influenced the jury's decision to convict." *State v. Reichmand*, 2010 MT 228, ¶ 23, 358 Mont. 68, 243 P.3d 423. "Rather, the question is whether the State can show there is no reasonable possibility that the tainted evidence *might* have contributed to the conviction." *Reichmand*, ¶ 23.

¶76 Here, the State has failed to show that there is no reasonable possibility that the State's line of questioning regarding Sandberg's attempt to wipe his phone contributed to Sandberg's conviction. The State has not pointed to any alternative evidence admitted to prove Sandberg's consciousness of guilt as to the crimes charged. And while Andrade testified that Sandberg was a drug dealer and Adkins stated that he "started getting [drugs] from [Sandberg]," the testimony of two drug users, one of which was the complaining witness, is not the same quality of evidence as Sandberg's subsequent act of concealment, which was used to evidence his consciousness of guilt as to drug dealing, as well as a propensity for drug dealing.

¶77 Given the State's line of questioning and its use of the inadmissible evidence during closing argument, it is difficult to imagine a juror not being convinced that Sandberg was

39

in fact a pissed off drug dealer; a fact that the State sought to prove not only to cast Sandberg in an unsavory light, but to bolster Andrade's credibility. If Sandberg was in fact a pissed off drug dealer, a juror would be more apt to believe that Andrade stole drugs from Sandberg rather than money and that Sandberg was the type of person who would commit a violent or non-consensual act. Thus, the jury could infer that Sandberg was lying about what had been stolen from him and lying about the events pertaining to the charged offenses. The State further used the inadmissible evidence to paint the picture that Sandberg "wasn't a person to be ripped off, that he's not a drug dealer that you can mess with," and that "his whole reason for being [at Hill's camp]" was to "terrorize Miss Andrade," "making sure that she [got] the message that he's not to be messed with," as the State set forth in its closing argument. Review of the record leads us to conclude that there is a reasonable possibility that the subsequent act evidence introduced might have contributed to Sandberg's conviction. Accordingly, the State has failed to meet its burden in demonstrating the District Court's error as harmless.

## CONCLUSION

¶78 The District Court abused its discretion in allowing Andrade—the complaining witness—to be referred to as a "victim" throughout trial over Sandberg's objections. The repeated references were pervasive and violated Sandberg's presumption of innocence and his right to a fair trial, requiring reversal. Further, the District Court abused its discretion in permitting the State to question Sandberg about his prior request to his girlfriend to "wipe" his phone, as such evidence was irrelevant, unduly prejudicial, and exceeded the

40

scope of any permissible impeachment purpose. Accordingly, we reverse Sandberg's convictions and remand for a new trial.

/S/ INGRID GUSTAFSON

We Concur:

/S/ KATHERINE M. BIDEGARAY
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA

Justice Beth Baker, dissenting.

¶79     I share the Court's view that prosecutors and witnesses should avoid referring to a complaining witness as the "victim," and both parties and trial courts should use similar care to tailor jury instructions when appropriate. Applying well-established standards of review to Sandberg's preserved and unpreserved claims of error on the record in this case, however, I would hold that the District Court did not abuse its discretion when it ruled in context that the trial references to which Sandberg objected were not prejudicial and that Sandberg has failed his burden on appeal to show either a manifest miscarriage of justice or prejudice to his substantial rights.

¶80     The Court accepts Sandberg's argument that the prosecution's references to "victim" vouched for Andrade's credibility by implying that her version of events was truthful, thereby suggesting that Sandberg was guilty and undermining his presumption of innocence. Opinion, ¶¶ 37, 47. Courts recognize that prejudice to the defendant depends on the context in which the term "victim" is used. *See California v. Ruiz*, No. B278461, 2018 WL 4292027, at *3 (Cal. Ct. App. Sept. 7, 2018) ("The term victim is a malleable

41

term the meaning of which depends on the context in which it is used." (internal citations omitted)); *Carrera*, 517 P.3d at 461 (explaining that "statements referring to the particular complaining witness in the case as a victim often are more concerning than general statements referring to victims of crime across a particular population" (citing *Juarez*, 489 P.3d at 242) (internal quotations omitted)); *Oregon v. Avdeyev*, 482 P.3d 115, 118 (Or. Ct. App. 2021) ("[T]he propriety of a prosecutor's use of the term 'victim' necessarily depends on the context . . . ."); *Juarez*, 489 P.3d. at 242 ("[T]he context of the specific testimony in which the term 'victim' is used can make a difference . . . . [T]he identity of the speaker matters."). *Compare Ohio v. Madden*, 100 N.E.3d 1203, 1211 (Ohio Ct. App. 2017) (distinguishing when the prosecution "intentionally [seeks] to elicit prejudicial testimony" from when law enforcement uses "victim" synonymously with complainant during testimony), *with Avdeyev*, 482 P.3d at 119-21 (holding that the prosecution's questioning was impermissible vouching because "the repeated use of 'victim' in questioning communicated that [the officer] believed [complainant] to be a victim of a crime, and not merely his intention to *determine* if that was so." (emphasis in original)), *and cf. Byrne*, ¶¶ 6, 8-9, 35.

¶81     The Court's analysis sweeps far too broadly, ignoring the context in which the term "victim" was used at trial and failing to distinguish between Sandberg's preserved claims of error and the objections he makes for the first time on appeal. I will address both.

**Preserved Claims**

¶82     Defense counsel's first objection came when the prosecutor asked Officer Harrington about the role of the fire department as seen on the officer's body-cam footage.

Officer Harrington responded, "[T]o make sure that the victim didn't have any immediate medical needs." Officer Harrington explained that when he arrived at the fitness center, he needed only basic information, such as where the crime was committed and who was involved. The prosecution asked, "Would you generally engage in a detailed interview with the victim in this kind of circumstance[?]" After the District Court overruled defense counsel's objection to the prosecutor's "characterization of victim," the Officer responded, "In that type of location you can imagine what kind of emotions a victim might be feeling in that situation." Officer Harrington used the term while explaining the customary procedures when responding to a reported crime. *See Madden*, 100 N.E.3d at 1208-1211 ("Courts have observed that the term victim, to law enforcement officers, is a term of art synonymous with complaining witness. Thus, courts have found a lack of prejudice where a law enforcement officer uses the term 'victim' in such a manner." (internal citations and quotations omitted)); *Iowa v. Frey*, Iowa App. No. 06-1081, 2007 WL 1827423 (Iowa Ct. App. June 27, 2007); *Wigg*, 889 A.2d 233; *Washington v. Harvey*, No. 29513-3-III, 2012 WL 1071234 (Wash. Ct. App. Mar. 29, 2012); *Carrera*, 517 P.3d 440.

¶83    Officer Ken Smith, who also was dispatched to Andrade's call, recalled that he spoke briefly with Andrade, but his duty on dispatch was primarily to transport her to the police station and to gain knowledge about where the crime had occurred. The prosecution asked, "Did you try to engage her in this full interview about what occurred?" Officer Smith responded, "I did not. We don't interview victims about the incident more than we have to . . . ." After defense counsel objected to the term "victim" as "buttressing," Officer Smith rephrased, saying, "[W]e don't interview people more than we have to to make them

43

relive what occurred to them more than once." Like Officer Harrington, Officer Smith discussed more generally the investigative process and policies at the Missoula Police Department. He used the word "we" to mean himself and other officers. He also used the word "victim" in the plural form to suggest he was talking about a class of unspecified persons falling within the category of "victim." This became apparent upon his rephrasing, when he used the word "people." The officer was not discussing solely Andrade when he used the term "victim."

¶84    Only once more did a witness use the term "victim." Serologist Lacey Vansgrinsven, describing the contents of her report, testified, "The first one, kit 1 is sexual assault evidence collection, suspect, and the other one is labeled 002 and that one is sexual assault collection kit, victim." It may be inferred from the context that Ms. Vangrinsven used the term generally to mean "alleged victim" when she described her process to include two test kits—one for the "suspect" and one for the "victim." A serologist is simply given samples from two individuals and must label them. Even if a "complaining witness" label would be more appropriate—and it would be—using "suspect" and "victim" in no way suggested Ms. Vangrinsven's personal opinion about the facts of this case.

¶85    Applying "reason, principle, and common human experience," *Estelle*, 425 U.S. at 504, 96 S. Ct. at 1693, the testimony of the officers and serologist show their use of terminology familiar to their professions. The point is, context matters. The objected-to uses of the term "victim" in the colloquies challenged here largely consisted of explaining standards of procedure or providing context to the investigation. They did not directly or indirectly imply a witness's personal opinion that Sandberg was guilty or that Andrade's

44

testimony was credible; rather, "victim" was used primarily for its broader meaning—unspecified complainants or complaining witness. Viewing the isolated references in context here, none expressed personal beliefs or opinion that Sandberg had sexually assaulted Andrade. The law enforcement officers described their responses to a report that Andrade had been victimized; they explained their processes for investigating such a report, including interactions with the reported victim. Applying the appropriate standard of review, I would conclude that the District Court did not abuse its discretion when it ruled that such referencing during these witness examinations did not, "in this context[, create] any sort of undue prejudice or any violation of his presumption of innocence." Sandberg's objections to the presentation of this evidence were the only claims preserved for appeal.

**Unpreserved Claims**

¶86 Sandberg did not object when the prosecutor made reference to the "adult victim in this case" during voir dire. Nor did he object to the prosecutor's two uses of the term "victim" during opening statements. And as noted, he did not object to Officer Harrington's first reference to "victim" in his testimony.

¶87 When a party fails to preserve their claim by timely objecting, we may exercise our discretionary plain-error review, but we do so "sparingly, on a case-by-case basis" and by "considering the totality of circumstances of each case." *State v. Akers*, 2017 MT 311, ¶ 13, 389 Mont. 531, 408 P.3d 142 (internal quotations and citations omitted). When the accused's "fundamental rights are invoked, we may choose to review a claim . . . where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of fundamental fairness of the trial proceedings, or may

45

compromise the integrity of the judicial process." *Akers*, ¶ 13 (citation omitted). To reverse, the accused first must establish that their fundamental rights have been implicated. *Akers*, ¶ 13 (citation omitted).

¶88 When reviewing for plain error, we do not presume that the statements are prejudicial; rather, the defendant must show prejudice as evidenced in the record. *State v. Miller*, 2022 MT 92, ¶ 36, 408 Mont. 316, 510 P.3d 17. Our consideration is whether the comments or conduct were substantially prejudicial to the accused "under the totality of the circumstances in each case." *Miller*, ¶ 21 (citations omitted). When considering alleged prosecutorial misconduct, "[p]rejudice is not inferred; rather, the defendant must demonstrate, from the record, that the prosecutor's misstatements prejudiced him." *State v. Dobrowksi*, 2016 MT 261, ¶ 28, 385 Mont. 179, 382 P.3d 490 (internal quotations and citations omitted); *Miller*, ¶ 36.

¶89 To convict Sandberg of sexual intercourse without consent, the jury needed to resolve that the admitted sexual encounter was nonconsensual or that Andrade was incapable of consenting. *See* §§ 45-5-501(1), -503, MCA. To convict him of aggravated kidnapping, the jury needed to determine that Sandberg held Andrade at Hill's camp by threat or use of physical force for the purposes of inflicting bodily injury or terrorizing her. *See* § 45-5-303(1)(c), MCA.

¶90 Sandberg bears the burden on appeal of "firmly convincing this Court" that he has met the plain-error standard. *State v. George*, 2020 MT 56, ¶ 5, 399 Mont. 173, 459 P.3d 854. He argues that because the issue of consent hinged on the jury's assessment of Andrade's and his credibility, using the term "victim" was prejudicial and a manifest

miscarriage of justice. It is the Court's obligation to examine the record as a whole to evaluate whether these references call the fairness of the trial into question. In my view, the Court overlooks significant portions of the trial record and fails to consider "the totality of circumstances of the case" when it finds reversible error here.

¶91 When Andrade called 911 after her encounter with Sandberg, she said through sobs that she was scared and that she had been screaming for help for a couple of hours. She recalled arriving at the camp around 12:10 p.m. and said Sandberg had assaulted her. She claimed that he had ejaculated on her face and threatened to "beat [her] with a baseball bat and then throw [her] in a hole." She believed that people were standing outside of Hill's tent during the events. The First Step Resource Center nurse who performed the acute sexual trauma examination observed that Andrade was "sobbing so forcefully that her face was red, swollen, eyes puffy, and tears [were] streaming down her face."

¶92 At trial, Andrade testified that Sandberg threatened to kill her. She stated that Sandberg would not allow her to leave and hit her numerous times with the small bat. She explained that she screamed and pleaded to be let go several times. She recalled that Sandberg also called Adkins sometime in the middle of the afternoon. Sandberg held the small bat over Andrade's head to keep her silent during the call. Adkins testified that Sandberg told him over the phone that he could not "hold" Andrade much longer and that Adkins needed to come to the Island. Adkins testified that he did not go to the Island because he suspected Sandberg was trying to set him up.

¶93 Andrade explained that when it became clear she could not pay, Sandberg continued to threaten to kill her, undid his own pants, and aggressively forced his penis in her mouth

47

while holding a yellow axe handle in his hands. Sandberg ejaculated and wiped his semen across her face. Sandberg persisted in threatening to kill Andrade. Hill recalled Sandberg telling Andrade she could leave and Andrade "weeping around" or "whining."

¶94 At his police interview, Sandberg explained that he had been looking for Andrade for months. On September 9, someone had told him she was at Hill's camp. He admitted to bringing the small bat when he went looking for her there. When asked if bringing and brandishing the bat was threatening, Sandberg responded, "Yeah, I'm sure it was . . . I wasn't there to be friendly." Detectives asked Sandberg if he knew whether Andrade knew what he could do with the bat. Sandberg replied, "She knows exactly what I can do with it . . . . She was lying. And so I go, '[G]o ahead, stop lying! . . . And I went like that." He then demonstrated hitting downward with the bat. He affirmed that he knew Andrade was scared because their "negotiations" weren't working out. He explained, "Well, yeah, I was you know, I played it off that way too. I wasn't there to be nice." When detectives asked Sandberg if he thought Andrade felt obligated to offer the oral sex, he replied that she would have done "anything in her power to get out of the situation" because "she was in trouble. She was caught." Sandberg repeated several times during the interview that once he received oral sex, he "let [Andrade] go."

¶95 Sandberg's testimony at trial was similar. He admitted to being mad at Andrade and to disarming her by taking her purse. He stated that at one point he was "roaring" so intensely at Andrade that she passed out and convulsed from "fear, panic, terror or whatever you want to call it." He claimed that he "rapped" her on the foot with the small bat only to try to rouse her after she lost consciousness and that any injury to her legs was because she

48

fell. Andrade began screaming when she gained consciousness. When asked if he was aware that Andrade was scared and believed she could have gotten hurt, Sandberg stated:

> I think anybody in that situation, anybody who stole from you or anybody that stole from anybody else and all of a sudden sees them nine months later and they walk in and you haven't seen that person for a while, I think anybody would think they were going to be hurt. I would myself.

And when asked whether he knew Andrade did not have money to repay him, he admitted that he knew she did not have anything to offer him but said that he only wanted to confront her. Sandberg acknowledged calling Andrade a "street rat" and a "worthless worm." He admitted to saying, "[Y]ou disgust me, you worthless bag whore," immediately after receiving oral sex. When asked whether the sex was consensual, he explained it was, because "that's all she had to offer." Sandberg admitted that he was aware Andrade believed he could hurt her. He also ultimately conceded that he told Andrade when she could leave.

¶96 By Sandberg's own admission, he knew Andrade felt threatened and gave oral sex because it was the only thing within her power to get out of the situation. Sandberg was aware she had no money, but he insisted they "negotiate" and berated her so forcefully that he witnessed Andrade pass out from what he believed to be fear. Sandberg's only statement that suggested Andrade's consent was his insistence that she "offered" the oral sex. Whether Andrade offered does not, under the undisputed circumstances, tend to show consent freely given. Sandberg knew she was afraid and had no other option to "repay" him. These same facts from Sandberg's own testimony also support the jury's finding that he committed aggravated kidnapping when he held Andrade at Hill's camp by threat or use

49

of physical force for the purposes of inflicting bodily injury or terrorizing her. *See* § 45-5-303, MCA.

¶97 The Court does not engage with this evidence when it finds Sandberg entitled to relief. Sandberg described an admittedly threatening encounter that ended with sexual intercourse when Andrade had no other option. The Court also largely overlooks Hill's testimony and the physical evidence from Andrade's hospital examination, both of which corroborated her version of events. In light of the evidence and the record as a whole, Sandberg has not established that the prosecutor's opening references to Andrade as the victim of crime—the State's theory of the case—or the State witnesses' use of "victim" in describing their general procedures for crime investigation undermined the fairness of his trial.

¶98 Even during opening statements, the prosecutor impressed upon the jury that "the law protects all of us, you, me, Miss Andrade, Mr. Sandberg equally, regardless of whether you have money or not, regardless of whether you own the bridge or live under it." To the extent this suggested that Andrade was a victim, the prosecutor never vouched for Andrade's credibility or elicited a witness to do the same. *Contra Hayden*, ¶ 32; *Byrne*, ¶¶ 6-9, 29; *see also Miller*, ¶ 38. The prosecutor also did not state or imply a personal belief that Sandberg was guilty or otherwise undermine his presumption of innocence. *Contra Lawrence*, ¶¶ 19-20; *State v. Favel*, 2015 MT 336, ¶ 26, 381 Mont. 472, 362 P.3d 1126. Instead, the prosecutor urged the jury to rely on Sandberg's own testimony and statements to understand Andrade's lack of consent. The prosecution's theory of the case emphasized the jury's role in the trial and encouraged them to listen closely, to evaluate

the facts, and to apply those facts to the law. *See also Avdeyev*, 482 P.3d at 118 (finding no error in trial court's ruling that "the state may use the words 'victim' and 'disclosure' during opening and closing statements").

¶99 Importantly, Sandberg undermined his own credibility when his testimony substantially corroborated Andrade's material allegations—essentially admitting that he held her in the tent until she gave him sex "to get out of the situation." *Contra Lawrence*, ¶ 18. Given the totality of the circumstances, the prosecutor's unchallenged reference to "victim" during voir dire and opening statements, considered together with the witnesses' use of "victim," did not result in a manifest miscarriage of justice. Having reviewed the record, considered evidence presented by both sides, and examined the contexts in which "victim" was used, I would conclude that Sandberg has not met his burden under the plain-error doctrine to justify reversal for prosecutorial misconduct. *Favel*, ¶ 13.

**Jury Instructions**

¶100 Considering Sandberg's challenge on appeal to the two jury instructions containing the term "victim," the Court disregards black-letter law and settled precedent to conclude that his standing objection preserved this claim.

¶101 Continuing objections permit counsel to "voic[e] one objection at trial to preserve for appeal multiple instances of similar judicial decisions *to admit or refuse to admit evidence*." 157 Am. Jur. Trials 1 § 1 (2018) (emphasis added). A standing objection thus alleviates the need for counsel to make repeated objections on the same point in front of the jury. *Cf. Palmer by Diacon v. Farmer's Ins. Exchange*, 261 Mont. 91, 110, 861 P.2d 895, 907 (1993); *see also* 88 C.J.S. Trial § 211 (2025) ("Where an objection to evidence is

51

distinctly made and overruled it need not be repeated to the same *class of evidence* subsequently received even if the evidence is given by, or the questions asked of, another witness.") (emphasis added). Similar to rulings on motions in limine, we recognize that "a party may not wish to register an objection *in the presence of a jury* for tactical reasons, yet may wish to preserve the objection on appeal." *Byrne*, ¶ 20 (emphasis added); *see also Favel*, ¶ 19. Sandberg's standing objection after Officer Smith's testimony preserved any claim of error regarding the admission of similar evidence.

¶102 "[O]ther types of possible trial errors," however, like "jury instructions, for example, are often subject to separate procedural rules." 157 Am. Jur. Trials 1 § 1. Under § 46-16-410(3), MCA, "[a] party may not assign as error any portion of the instructions or omissions from the instructions unless an objection was made specifically stating the matter objected to, and the grounds for the objection, *at the settlement of instructions*." (emphasis added). Accordingly, to secure appellate review of jury instructions, a party must object specifically when instructions are settled. *State v. Dethman*, 2010 MT 268, ¶ 31, 358 Mont. 384, 245 P.3d 30 (citing *State v. Minez*, 2004 MT 115, ¶ 28, 321 Mont. 148, 89 P.3d 966); *see also State v. Robbins*, 1998 MT 297, ¶ 31, 292 Mont. 23, 971 P.2d 359 (citing *State v. Smith*, 220 Mont. 364, 715 P.2d 1301 (1986)). A party's failure to put an objection to given instructions on the record or to propose alternative instructions constitutes waiver of the issue for appeal purposes. *Vincent v. BNSF Ry. Co.,* 2010 MT 57, ¶¶ 23-24, 355 Mont. 348, 228 P.3d 1123. Jury instructions given without objection become law of the case. *Seltzer v. Morton*, 2007 MT 62, ¶ 144, 336 Mont. 225, 154 P.3d 561.

¶103   The settlement of jury instructions occurs before the judge alone, when there is no concern about repeated objections in front of the jury.   The record shows that defense counsel—despite her earlier evidentiary objection—explicitly stipulated to Jury Instructions No. 24 and 29.[1]   *See Dethman*, ¶¶ 32-33 (holding party's stipulation to jury instruction an "acquiescence in error tak[ing] away the right to objec[t] to it," and thus held plain-error review unnecessary).   A party does not preserve its claim of instructional error by objecting to the admission of evidence.   The Court cites no authority for such a proposition, and the authority it cites does not support its conclusion that Sandberg preserved his claim.   Opinion, ¶¶ 33-36.   *See State v. Grimes*, 1999 MT 145, ¶ 39, 295 Mont. 22, 982 P.2d 1037 (holding "that when a party *proposes an instruction* which is rejected by the trial court, that party has made a sufficient objection for the purposes of § 46-16-410, MCA, and has no duty to make a further objection for the record" (emphasis added)).   *See also State v. Raugust*, 2000 MT 146, ¶ 17, 300 Mont. 54, 3 P.3d 115 (refusing to consider instructional error when the theory raised on appeal "was not contained in the record of the objection to the instruction made during the final settling of jury instructions").

¶104   Montana law is not only very clear but is consistent with the general authorities cited above.   Settlement of instructions is a separate part of the trial, conducted by the judge, in which instructions are offered, objections are made and discussed, and a ruling is made by

---

[1] At the settlement of jury instructions, defense counsel reviewed the State's Amended Jury Instructions.  Jury Instructions No. 24 and 29 are discussed and identified in the record as Proposed Jury Instructions No. 19 and 24, respectively.  Defense counsel specifically objected only to Proposed Jury Instructions No. 11 and 20, neither of which are the disputed Jury Instructions.

the court, all for which a record is made. Allowing a standing evidentiary objection to also stand as a later objection to jury instructions—particularly those to which a party has stipulated—is contrary to Montana law governing the trial process and unfair to the trial judge given no ability to rule correctly on an instructional error.

¶105 Because Sandberg made his standing objection during the presentation of evidence and acquiesced when the court and counsel met to review instructions, he failed to preserve the claim for appellate review. Had Sandberg reminded the court of its earlier comment, counsel could have provided further input on the instructions and suggested a modification to eliminate the word "victim."[2]

¶106 This Court reviews jury instructions in criminal cases to determine "whether the instructions, as a whole, fully and fairly instruct[ed] the jury on the law applicable to the case." *Mathis*, ¶ 44 (citation omitted). We review the challenged instructions in their entirety and "in connection with the other instructions given and with evidence introduced at trial." *Murphy Homes, Inc. v. Muller*, 2007 MT 140, ¶ 74, 337 Mont. 411, 162 P.3d 106. "A district court has broad discretion in formulating jury instructions," and we will not find reversible error unless the district court's "mistake in instructing the jury . . . prejudicially affect[ed] the defendant's substantial rights." *State v. Spotted Eagle*, 2010 MT 222, ¶ 6, 358 Mont. 22, 243 P.3d 402 (citation omitted); *State v. Daniels*, 2003 MT 247, ¶ 36, 317

---

[2] Sandberg suggests no reason why the court would not have agreed. This Court is reluctant to fault a trial court where it was not provided the opportunity to consider its error. *State v. Montgomery*, 2010 MT 193, ¶ 11, 357 Mont. 348, 239 P.3d 929; *Price*, ¶ 17.

Mont. 331, 77 P.3d 224. Even on a preserved claim, the party assigning error bears the burden of showing prejudice. *Murphy Homes, Inc.*, ¶ 74.

¶107 Notable in this case, Jury Instruction No. 24 recites verbatim Section 45-5-511(4)-(5), MCA, and Jury Instruction No. 29 is a pattern jury instruction from the Criminal Jury Instruction Commission. *See* MCJI 5-121 (2022). These are fair instructions on the "law applicable to the case." *Mathis*, ¶ 44; *State v. Ament*, 2025 MT 97, ¶ 39, 421 Mont. 502, 568 P.3d 535 (holding defendant did not "meet his burden to show . . . how [a] pattern criminal jury instruction implicated his fundamental right"); see *also North Carolina v. Henderson*, 574 S.E.2d 700, 723 (N.C. Ct. App. 2003) ("While defendant makes a valid point that the use of a more neutral term such as 'alleged victim' or 'complainant' would remove any possibility that the jury would confuse the trial court's instruction for the comments on the evidence, defendant has failed to show prejudicial error for the trial court to follow the pattern jury instruction."); *North Carolina v. Jones*, 752 S.E.2d 212, 215 (N.C. Ct. App. 2013) (holding the trial court did not commit plain error because the accused failed to request modifications to pattern jury instructions excluding the use of the term "victim").

¶108 The Court relies heavily on the Texas Court of Appeals' *Talkington* decision to conclude that the instructions prejudiced Sandberg's right to a fair trial. Opinion*, ¶¶ 45-46. In that case, however, the trial court's instructions expressly characterized the complaining witness in the case as the victim. *See Talkington*, 682 S.W.2d at 674-75 (holding improper an instruction to the jury that if it found evidence beyond a reasonable doubt that the defendant "did then and there unlawfully intentionally or knowingly by means of force or

55

threats have sexual intercourse with (KB), *hereinafter called victim*, a female not his wife without the consent of the said *victim* and by acts, words, and deeds placed the said *victim* in fear of harm, then you will find the defendant guilty of the offense of rape." (emphasis in original)).

¶109 Again, context matters. Here, the instructions using "victim" were not specific to the individuals involved in the case. And notably, the District Court instructed the jury that the court's remarks and instructions were not "intended to express [the court's] opinion as to the facts in this case" and emphasized that the jury's verdict should be based "solely [on] the evidence introduced at trial and the law as stated . . . by [the court]." In other instructions, the court stressed to the jury that they were the "sole judges of credibility," including the believability and weight given to the evidence. The instructions provided that a plea of not guilty required the State to prove guilt beyond a reasonable doubt. Finally, the District Court instructed that the presumption of innocence "remains with [the Defendant] throughout every stage of the trial and during your deliberations on the verdict. It is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the Defendant is guilty."

¶110 If the appropriate standards are applied, Sandberg cannot in my view meet his heavy burden on appeal to justify reversing his conviction for plain error based on stipulated jury instructions. *See Mathis*, ¶ 43 (citing *State v. Wilson*, 2007 MT 327, ¶¶ 36-39, 340 Mont. 191, 172 P.3d 1264; *State v. Birthmark*, 2013 MT 86, ¶¶ 9, 20-21, 369 Mont. 413, 300 P.3d 1140). Viewed in their entirety, the instructions did not imply the trial judge's opinion of witness credibility or of Sandberg's guilt. *See Nomura*, 903 P.2d at 722 (holding jury

56

instruction containing term "victim" was harmless error because the "other instructions provided a barrier to any improper inferences from the court's comment that may have prejudiced the [d]efendant"). This Court "presumes that juries follow instructions provided by the [trial] court." *State v. Sinz*, 2021 MT 163, ¶ 31, 404 Mont. 498, 490 P.3d 97 (citations omitted). We should presume here that the jury followed the other instructions as explicitly stated.

¶111 Sandberg has failed to demonstrate plain error from reference to "victim" in the two challenged instructions. Neither instruction referred either to the facts of the case or to the parties. Both, instead, were general statements of law. The instructions, as a whole, fully and fairly apprised the jury of the applicable law, including their role in determining witness credibility and the presumption of innocence. *Ament*, ¶¶ 39-40. The Defendant has not carried his burden in showing that the instructions' inclusion of the term "victim" resulted in a "manifest miscarriage of justice," affected "the fundamental fairness of his proceedings," or "compromised the integrity of his judicial proceedings." *Mathis*, ¶ 23 (citation omitted).[3]

¶112 We may reverse a conviction and remand for a new trial if the defendant made timely objections to preserve the issue and if the defendant's substantial rights were

---

[3] Though the Court's Opinion renders it unnecessary to consider Sandberg's claim of ineffective assistance of counsel, I would conclude that Sandberg has not shown a reasonable probability that, but for defense counsel's failure to object to the use of the term "victim" during the prosecutor's remarks or in two jury instructions, the results of his trial would have changed. As discussed, his statements to detectives and his own trial testimony should provide us with confidence that those references did not affect the outcome of these proceedings. For those same reasons, I would hold that defense counsel's failure to object during the settlement of jury instructions did not prejudice Sandberg. *Stock v. State*, 2014 MT 46, ¶ 21, 374 Mont. 80, 318 P.3d 1053 (citing *Strickland v. Washington*, 466 U.S. 668, 697,104 S. Ct. 2052, 2069 (1984)).

prejudiced. Sections 46-20-104(2), -701(1), MCA. The Court invokes a harmless error standard of review without recognizing that—except for the evidentiary objections—the proper standard is plain error. That standard places a heavy burden on the appellant to demonstrate that failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of fundamental fairness of the trial proceedings, or may compromise the integrity of the judicial process. *George*, ¶ 5.

¶113 The Court, in my view, fails meaningfully to examine whether Sandberg's claimed errors, reviewed in the context of the trial record as a whole, prejudiced his substantial rights to a fair trial. Section 46-20-701, MCA. Its focus on the number of times the term "victim" was uttered during trial lacks examination of those utterances in the context of the entire record. Viewed in the context of that record, I would conclude that Sandberg was not prejudiced. The court and the prosecution throughout the trial emphasized the importance of the jury's role as the sole judge of the weight, credibility, and veracity of the facts. The principles of the presumption of innocence, proof beyond a reasonable doubt, and the province of the jury were repeated assertively. Most importantly, viewed in light of Sandberg's own testimony and statements to law enforcement, finding prejudicial, reversible error in the context of this case is anomalous. *Compare, e.g., Miller*, ¶¶ 31-38 (despite prosecutor's comment—among others—that "[w]e are here because the [d]efendant is guilty of assault with a weapon" and that "[t]he crime had already been committed," given the totality of the record, the defendant was not prejudiced).

¶114 For the reasons discussed, Sandberg has not met his burden on appeal. The cumulative effect of the challenged and unchallenged references to "victim," even if

improper, did not substantially prejudice Sandberg's right to a fair trial or render the proceedings manifestly unjust.

**Sandberg's Evidentiary Claim**

¶115   Turning to Sandberg's second claim, I would conclude that the District Court did not abuse its discretion when it admitted the Defendant's statements to his girlfriend to "wipe" his phone. Both Adkins and Andrade testified that they had taken methamphetamines from Sandberg when he was hospitalized in April 2021.   They explained that their relationship with Sandberg revolved primarily around using and buying methamphetamines from him.   On direct examination, Sandberg claimed it was not methamphetamines but thousands of dollars that Andrade had stolen from him.  He was particularly hurt because they were friends, and he would give Andrade anything if she just asked, so long as he had the resources.  He normally was not inclined to expect things in return.  He testified that in April, he had just picked up the money from his brother and planned to use the funds as a rental deposit.  He stated that after leaving the hospital he was frustrated and disappointed because a friend he had helped several times left him for dead and rendered him foreseeably homeless because he could not make his deposit.

¶116   The prosecutor on cross-examination sought clarification from Sandberg on the inconsistencies between his and Andrade's and Adkins's testimonies on their relationship and what was stolen from his vehicle.  As a part of this questioning, the prosecutor asked if Sandberg was a drug dealer or dealt drugs to Adkins and Andrade.  Sandberg denied this. The prosecutor asked why Adkins and Andrade had reason to lie about stealing methamphetamines instead of money.  The prosecutor asked whether the "personal and

private information" on his phone that Sandberg was concerned about was the fact that he was a drug dealer, which he had previously denied. The court overruled Sandberg's objection to this line of questioning because "it was a valid impeachment and frankly, the statement attributed to him goes to consciousness of guilt."

¶117 The Court agrees with Sandberg that the prosecution's line of questioning served an improper propensity purpose, even if it had limited appropriate impeachment value. Opinion, ¶ 73. The Court also concludes that the evidence was "unduly prejudicial." Opinion, ¶¶ 66-69. But Sandberg did not raise at trial any claim under M. R. Evid. 403 that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. He failed to preserve such a claim for appeal. M. R. Evid. 103(a)(1). *See Ament*, ¶ 20 (noting that "we consistently do not allow" a defendant to "presen[t] a new theory of inadmissibility for the first time on appeal").

¶118 Evidence of prior bad acts is not objectionable "[s]imply because otherwise properly admissible evidence might imply [the defendant] was of bad character." *Daniels*, ¶ 45. For example, "Evidence of concealment does not violate Rule 404(b) when admitted to prove consciousness of guilt." *State v. Strizich*, 2021 MT 306, ¶ 22, 406 Mont. 391, 499 P.3d 575 (citing *State v. Moore*, 254 Mont. 241, 836 P.2d 604 (1992)). During the commission of the alleged crime, Sandberg called and texted Adkins, telling him that Andrade was at Hill's camp. After calling Adkins, Sandberg received a text from another individual notifying Sandberg that Adkins would not be coming to the Island. Sandberg also attempted to contact Andrade between April and September 2021 after not seeing her for several months to discuss what happened that night he was hospitalized. His phone

likely still contained incriminating or circumstantial evidence, which Sandberg thought was important to conceal.

¶119 The Court cites the transaction rule, § 26-1-103, MCA, to argue that Sandberg asking his girlfriend to wipe his phone is not "inextricably linked or intertwined with" the crime charged and that the evidence of concealment thus could not be used to show consciousness of guilt. Opinion, ¶ 61. But Sandberg's phone contained communications and information material to why he sought Andrade out to collect on the purported debt, the nature of his attempted contacts with her prior to their encounter, and his communications directly prior to and during the alleged offense. Sandberg's concealment of the information on the phone was relevant to the offense charged because of its bearing on Sandberg's mental state and corroborative evidence for the events described.

¶120 The District Court also allowed the questioning as permissible impeachment. "Evidence bearing on the credibility of the witness is relevant for impeachment purposes." M. R. Evid. 401; *State v. Zimmerman*, 2018 MT 94, ¶ 23, 391 Mont. 210, 417 P.3d 289. A defendant may "open the door to cross-examination . . . related to otherwise inadmissible other acts evidence by making such evidence relevant for the purposes of explaining or correcting a pertinent false impression or assertion, or rebutting an attack on credibility of another witness." *State v. Torres*, 2021 MT 301, ¶ 33, 406 Mont. 353, 498 P.3d 1256 (internal quotations and citations omitted).

¶121 Andrade and Adkins claimed to buy drugs from Sandberg and said they had stolen methamphetamines, not money, from him. Sandberg's statements claiming otherwise called into question the credibility of their testimony. When Sandberg claimed that his

relationship with Andrade was a selfless friendship and that she had stolen money from him, he opened the door to questioning on these issues. The prosecutor inquired about Sandberg being a drug dealer to impeach Sandberg and his statements inconsistent with Adkins and Andrade's testimony on what was stolen from the vehicle and their alleged close-knit relationship.

¶122 The record shows that drugs and drug transactions were integral to the relationships of the individuals involved in this case. The questioning was important—not to prove what Andrade had stolen from Sandberg—but to rebut Sandberg's self-characterization as a sad, selfless man—a portrayal he relied on to rebut Andrade's claims about his violent acts. In a case that turned on witness credibility, asking questions about Sandberg's drug dealing helped clarify the false impression that he wanted only to talk to Andrade in Hill's tent; rather, the State sought to show his relationship with Andrade to impeach his testimony and as evidence that he acted with purpose, motive, or knowledge during the events in question.

¶123 "Nothing in the Rules of Evidence provides that testimony admissible for one purpose and inadmissible for another is thereby rendered inadmissible." *Zimmerman*, ¶ 27 (citation omitted). A district court is granted broad discretion when ruling on admissibility of evidence. *Strizich*, ¶ 17 (citation omitted). The trial court did not act arbitrarily or without conscientious judgment when it determined that the prosecution's questions were appropriate. Even under M. R. Evid. 404(b), the State had a proper purpose for its questions. I would hold that the District Court did not abuse its discretion in allowing the colloquy.

¶124 In conclusion, I agree that prosecutors and witnesses should avoid using the term "victim" at trial when the element of consent is disputed. But the District Court did not abuse its discretion when it ruled in context that the trial references here were not prejudicial. I would find neither substantial prejudice nor a manifest miscarriage of justice for Sandberg's unpreserved claims on the same issue. Finally, the District Court did not abuse its discretion in its evidentiary ruling regarding Sandberg's phone. I would affirm.

/S/ BETH BAKER

Chief Justice Cory Swanson and Justice Jim Rice join in the dissenting Opinion of Justice Beth Baker.

/S/ CORY J. SWANSON
/S/ JIM RICE